STATE of Missouri, ex rel, Jeremiah
W. (Jay) NIXON, Appellant,

v.

PREMIUM STANDARD FARMS,
INC., Respondent.

No. WD 60954.

Missouri Court of Appeals,
Western District.

March 28, 2003.

William J. Bryan, Jefferson City, for
appellant.

Terry M. Evans, Smithville, Mark D. Anstoetter, Overland Park, KS, for respondent.

Before EDWIN H. SMITH, P.J., LOWENSTEIN and HARDWICK, JJ.

HAROLD L. LOWENSTEIN, Judge.

This case pivots on the construction of Missouri's statutory declaration which restricts corporations from engaging in farming, Section 350.015, RSMo 2000, and a specific exception that such a restriction does not apply to corporate utilization of agricultural land located in three counties in Northeast Missouri for production of swine, Section 350.016, RSMo 2000. The pertinent parts of both statutes, as well as the definitions are printed below, and repeated in this opinion.[1]

The facts in this court-tried case are not in dispute. The appellant, the State of Missouri, on relation of the attorney general, filed suit for a declaratory judgment and an injunction. Based on the construction of the statutes, the issue here boils down to a determination whether the respondent, a corporation operating a swine production facility may, without violating the proscription against corporate farming, lease part of its land to local farmers to graze cattle. To be more precise: Does the language of the exception in Section .016 create or allow a licensed swine production facility to allow cattle grazing on the land or the corporation without running afoul of Section .015?

**Facts**

Premium Standard Farms (PSF) owns and operates swine production facilities in Mercer, Putnam and Sullivan counties. PSF is authorized to operate these facilities under Section 350.016, which is an exception to the general prohibition against corporate farming. Section 350.016 allows corporate farming in Mercer, Putnam, and Sullivan counties for the limited purpose of "the production of swine or swine products." Cattle owned by local farmers, however, were being allowed to graze on PSF property pursuant to lease agreements.

In May of 2000, the State filed a petition for a preliminary injunction, permanent injunction, and a declaratory judgment prohibiting PSF from using its agricultural land to graze the cattle of local farmers. Section 350.030 authorizes the attorney general to file suits to enforce the provisions of the Farming Corporations Act, §§ 350.010–.030. *Neighbors Against Large Swine Operations v. Cont'l Grain Co.*, 901 S.W.2d 127, 129 (Mo.App.1995). A hearing was held and findings of fact and conclusions of law and judgment were issued were issued finding that: (1) § 350.016 is clear and unambiguous; (2) if agricultural land is used for swine production then § 350.015 does not apply; and (3) § 350.016 does not require that the land must be used "solely or exclusively for swine production." The court stated, "[i]t would have been a very simple matter for the legislature to completely change the

1. "After September 28, 1975, no corporation not already engaged in farming shall engage in farming; nor shall any corporation, directly or indirectly, acquire, or otherwise obtain an interest, whether legal, beneficial or otherwise, in any title to agricultural land in this state ..." § 350.015, RSMo 2000. "The restrictions set forth in section 350.015 shall not apply to agricultural land in counties located north of the Missouri River and west of the

Chariton River and having a population of more than three thousand five hundred and less than seven thousand inhabitants which border at least two other counties having a population of more than three thousand five hundred and less than seven thousand inhabitants which is used by a corporation or limited partnership for the production of swine or swine products." § 350.016, RSMo 2000.

meaning of the statute by inserting the word 'exclusively' or 'solely' into Section 350.016 RSMo."

The State stipulated to the following facts. PSF is using its land in Mercer, Putnam, and Sullivan counties for the production of swine and swine products. To do so, PSF had to acquire permits from the Missouri Department of Natural Resources ("DNR"). DNR issued National Pollutant Discharge Elimination System (NPDES) permits for each of PSF's farms. These permits are "no-discharge"[2] permits, under which PSF is required to land-apply "effluent"[3] generated by its swine facilities. Prior to issuance of its permit, PSF was required to demonstrate that it has adequate agricultural land upon which to apply the effluent. Under its permit, PSF must remove the nitrogen that is added to the land through the application of the effluent. There are three primary methods by which nitrogen can be removed from a field: (1) growing and harvesting crops on the field; (2) growing and baling hay on the field; and (3) pasturing cattle or other livestock on the field. For fields used as pasture, the grass takes up the nitrogen and the cattle that are grazed on the field remove the nitrogen by eating the grass. PSF relies on the removal of the nitrogen from the land application fields so that PSF can re-apply on the fields to continue swine production. PSF claims that its lagoons are designed to store one year of effluent, which is removed each year by pumping the effluent out of the lagoons and applying it to the land. If PSF did not land apply the effluent from the lagoons, the lagoons would become full and PSF would be forced to stop operating its farms.

Several persons testified. David Townsand, the Vice President of Environmental Affairs for PSF testified that he was in charge of making sure that PSF had the proper permits and complied with such permits. Townsand testified that PSF's NPDES permit controls the number of hogs allowed at a facility, the number of lagoons, the size of the lagoons, and the quantity of waste generated. The NPDES permit requires that PSF land apply the affluent it pumps out of the lagoons each year. Townsand testified that after the lagoons are drained, the effluent is applied to the fields, the cattle eat the grass on the fields, and the nitrogen is removed. If cattle were not allowed to graze on the land, the nitrogen would not be removed, more effluent could not be applied, the lagoons would fill up, and the production of swine would come to a halt.

Bill Hoffman, the Superintendent of Land Management for PSF testified that he was primarily responsible for negotiating land leases.[4] He testified that PSF provides over 12,000 acres of pasturelands to over forty local farmers. PSF has little or nothing to do with the cattle grazed on PSF's land other than to receive stocking reports to monitor the amount of nitrogen removed from the fields.

Kenneth Arnold, former chief of the land application unit at the DNR, gave the following testimony:

Q: Now after the affluent [*sic*] is applied, the nutrients applied then as part as part of the permitting or

---

2.  A "no discharge" facility is not allowed to discharge effluent directly into streams, etc.

3.  "Effluent" refers to the treated wastewater from the lagoons at PSF's farms; it contains nutrients and is applied to fields as fertilizer.

4.  Income derived from PSF's land lease program amounts to one-tenth of one percent of cash coming in compared to swine sales. Income from the land lease program is used to offset the expenses incurred to remove the effluent.

part of the permit requires them to remove the nitrogen from the soil?

A: Yeah, the permit requires that you basically balance the nitrogen inputs form the affluent [sic] of the manure with the nitrogen that's removed from each field so that you are utilizing all the nutrients; and the goal of that is to prevent loss of nutrients to the environment.

Q: And that is part of the PAN formula?

A: The PAN formula, the Plan Available Nitrogen, is to calculate the inputs and exports.

Q: And within the permit is there a PAN formula for PSF to use with respect to removing of nitrogen through the grazing of pasture with cattle?

A: Yes. Pasture is one of the methods that's listed in the permit.

Q: So the Missouri Department of Natural Resources recognizes the grazing of cattle to remove the nitrogen from the field as a legitimate means of removing nitrogen from the land application field?

A: Yes, the grazing of the cattle remove[s] the growing grass which does remove nutrients from the field.

Q: And that is a process recognized by MDNR?

A: Yes.

Q: With respect to the NPDES permit, the application of nutrient and the subsequent removal of the nitrogen so that there may be reapplication, those would be required or essential elements of the swine production process is that correct?

A: They are required by the—

MS. KINCANNON: I object. That calls for a legal conclusion.

MR. EVANS: Your honor, he's qualified.

THE COURT: They're talking about removal of nitrogen. You may answer.

THE WITNESS: It's required under the permit in order to operate, and the permit is required to operate a swine facility.

Jack Kuhle, an area farmer, testified that he leases land from PSF on which to graze his cattle. Some of the land he leases from PSF was land that had been owned by his grandparents and his parents up until the late 1970's or early 1980's. At that time his family expanded the farm and ended up losing it. The farm was sold to a man from California and Kuhle's family rented back the land. The owner eventually sold the land in 1993 to PSF and the Kuhle's have been raising cattle on the land ever since.

Kuhle stated that if he was not allowed to graze cattle on the land he would have to either dramatically downsized his operation and eliminate employees, or search for other land to rent. He mentioned, however, that there is no other land readily available in the area and in order to obtain some he would have to bid against neighbors.

The State argues in its sole point on appeal that the trial court misapplied the law in holding that PSF did not violate Section 350.016 because that statute did not contain the words "exclusively" or "solely" in limiting corporate use to swine production. The State claims that although Section 350.016 allows PSF to produce swine and swine products in Mercer, Putnam, and Sullivan Counties, grazing cattle on such land is not permitted.

Review is under *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976).

Statutory interpretation is an issue of law which this court reviews *de novo*. *Carmack v. Mo. Dept. of Agric.*, 31 S.W.3d 40, 46 (Mo.App.2000). When construing a statute, courts must " 'ascertain the intent of the legislature from the language used and give effect to that intent, if possible, and to consider the words used in their plain and ordinary meaning.' " *Id.* (quoting *Butler v. Mitchell–Hugeback, Inc.*, 895 S.W.2d 15, 19 (Mo. banc 1995)).

"To determine whether a statute is clear and unambiguous, this court looks to whether the language is plain and clear to a person of ordinary intelligence." *Russell v. Mo. State Employees' Ret. Sys.*, 4 S.W.3d 554, 556 (Mo.App.1999). This court will look past the plain and ordinary meaning of a statute only if the language is ambiguous or if its plain meaning would lead to an illogical result. *Lonergan v. May*, 53 S.W.3d 122, 126 (Mo.App.2001).

Section 350.015 states that "no corporation not already engaged in farming shall engage in farming; nor shall any corporation, directly or indirectly, acquire, or otherwise obtain an interest, whether legal, beneficial or otherwise, in any title to agricultural land...." "Farming" is defined in Section 350.010(6) as using or cultivating land for the production of agricultural crops and livestock or livestock products, among other things. "Agricultural land" is defined in Section 350.010(1) as "land used for farming."

Section 350.016 is an exception to Section 350.015. The version of Section 350.016 applicable here states as follows:

*The restrictions set forth in section 350.015 shall not apply to agricultural land* in counties located north of the Missouri River and west of the Chariton River and having a population of more than three thousand five hundred and less than seven thousand inhabitants which border at least two other counties having a population of more than three thousand five hundred and less than seven thousand inhabitants *which is used by a corporation or limited partnership for the production of swine or swine products.* (emphasis added).

The parties stipulated that this version of Section 350.016 only describes Mercer, Putnam, and Sullivan counties and applies to PSF's operations in those counties.[5]

The central issue in this dispute is that PSF is allowing its land to be leased by local farmers for cattle grazing. Cattle grazing, however, is considered "farming" under Section 350.015 and is prohibited. Thus, it must be determined whether: (1) the phrase "the production of swine or swine products" within Section 350.016 is ambiguous; and (2) if it is ambiguous, does cattle grazing fall within the meaning of "swine production."

Given that a person of ordinary intelligence may not contemplate all that is entailed in "the production of swine or swine products," the phrase as used in Section 350.016 is declared ambiguous and, therefore, requires statutory interpretation. In the last analysis, it must be determined whether cattle grazing as used in the context of the facts here necessarily includes the phrase "the production of swine or swine products."

"When a statute's language is ambiguous or uncertain, the judiciary should consider extrinsic matters, such as

---

**5.** The legislature amended § 350.016 in 1993. A Senate version and House version are both included in the Revised Statutes of Missouri with the remark, "H.B. 566 and S.B. 84 both amended this section during the 1st Regular Session of the 87th General Assembly, 1993. *Due to conflict, both versions are printed here.*" (Emphasis added). The only differences in the versions have to do with the description of the counties covered by the statute.

a statute's history, surrounding circumstances and objectives to be accomplished through the statute." *Riordan v. Clark,* 8 S.W.3d 182, 184 (Mo.App.1999)(citing *State of Missouri ex rel. County of St. Charles v. Mehan,* 854 S.W.2d 531, 535 (Mo.App. 1993)). Courts must avoid statutory interpretations that are unjust, absurd, or unreasonable. *Benoit v. Mo. Highway & Transp. Comm'n,* 33 S.W.3d 663, 673 (Mo. App.2000). The ultimate guide in construing an ambiguous statute is the intent of the legislature. *Lincoln Indus., Inc. v. Dir. of Revenue,* 51 S.W.3d 462, 465 (Mo. banc 2001).

To discern the meaning of the phrase "production of swine and swine products" in Section 350.016, it is instructive to understand the legislature's reasoning for prohibiting corporate farming in Section 350.015. Section 350.015 was construed for the first time in *State ex rel. Webster v. Lehndorff Geneva, Inc.,* 744 S.W.2d 801 (Mo. banc 1988).

The Farming Corporations Act was enacted in 1975. The purpose behind Section 350.015 was "to prevent the concentration of agricultural land, and the production of food therefrom, in the hands of business corporations to the detriment of traditional family units and corporate aggregations of natural persons primarily engaged in farming." *Id.* at 805. The Court in *Lehndorff Geneva* further explained:

> The legislature apparently believed that the superior financial and other business resources of these corporations would have a detrimental effect on traditional farming entities. This is because the cyclical nature of the farming industry periodically causes depressed markets and losses which large, diversified corporations are better able to sustain. Thus the traditional farming entities would operate at a competitive disadvantage.
>
> The statute also has the effect of prohibiting large corporations, already controlling much of the processing and distribution of agricultural commodities, from buying large tracts of land for production of the commodity in which they deal, so as to vertically integrate an industry to the competitive exclusion of traditional farming entities.
>
> It is within the province of the legislature to enact a statute which regulates the balance of competitive economic forces in the field of agricultural production and commerce, thereby protecting the welfare of its citizens comprising the traditional farming community[.] . . .

*Id.* at 805–06.

Section 350.016 was enacted in 1993. Obviously the legislature carved out an exception to the general prohibition against corporate farming in Section 350.015 by stating in Section 350.016 that "The *restrictions* set forth *in section 350.015 shall not apply to agricultural land* . . . which is *used* by a corporation or limited partnership *for the production of swine or swine products*" in Mercer, Putnam and Sullivan counties. (emphasis added).

It seems probable that the legislature did not anticipate that farming—e.g., growing hay or allowing cattle to graze on land—would play any role in or be a part of swine production. This is highly probable because the statute does not provide for what happens when swine production entails, necessarily or as a matter of economic necessity, crop-growing. Because specific intent is a mystery, the plain meaning rule applies, supplemented with a due consideration of statutory purpose.

If this court were to not consider methods of effluent removal as included within the phrase "the production of swine and

swine products," it would require this court to create a statutory interpretation that is illogical. The original purpose of Section 350.015, enacted in 1975, was to protect the local farmer from large corporations. In 1993, an exception was carved out in Section 350.016 which allows production of swine and swine products in a specified area of Northwest Missouri. A part of this process requires the land application of effluent and the grazing of cattle to remove nitrogen as required by PSF's NPDES permit. In an interesting twist, if the local cattle farmers are not allowed to graze cattle upon PSF's land they will be harmed by the same statute that sought to protect them; and PSF will not be able to continue operation, rendering the exception set out in Section 350.016 meaningless.

In summary, there is no question but that the activity complained of here, the grazing of cattle fits within the definition of "Farming" under Section 350.010(6) and that this activity took place on "Agricultural land" under (1) of that section. By the same token, there is no question but that the grazing of cattle is done for the purpose of removing nitrogen from the soil so as to justify state allowance of continuance of swine production. The corporation's decision to allow grazing, under the stipulated facts here, has not been for the purpose of illicitly promoting corporate cattle production, nor has there been a hint the grazing leases came into existence solely as a means for PSF to make extra money. Simply stated, the pasturing of cattle on the property used for swine production was for the purpose of satisfying the essential element of removing nitrogen from the land to keep the land usable for swine production. The leases in question are not prohibited but allow the production of swine and are sheltered by Section 350.016. Allowing the availability of pasture land *via* the leases for local individual cattle producers does not detract from but actually promotes the purpose chapter 350, to assist "... traditional family units and ... aggregations of natural persons primarily engaged in farming." *Lehndorff Geneva*, 744 S.W.2d at 805. This ruling renders moot the other arguments raised by the State.

This court finds that the term "the production of swine or swine products" necessarily includes cattle grazing for the purpose of nitrogen removal from the land application of effluent. For different reasons than found by the trial court, this court agrees with the trial court's result. This court is primarily concerned with the correctness of the trial court's result, not the route taken by the trial court to reach that result. *Venture Stores, Inc. v. Pac. Beach Co.*, 980 S.W.2d 176, 180 (Mo.App. 1998) (citing *Smith v. Estate of Harrison*, 829 S.W.2d 70, 73 (Mo.App.1992)).

The judgment of the trial court is affirmed.

All concur.