STATE of Missouri, ex rel. MISSOURI PIPELINE COMPANY, L.L.C., and Missouri Gas Company, L.L.C., Appellants,

v.

MISSOURI PUBLIC SERVICE COMMISSION, et al., Respondents.

No. WD 70325.

Missouri Court of Appeals, Western District.

Dec. 22, 2009.

As Modified Feb. 2, 2010.

Motion for Rehearing and/or Transfer to Supreme Court Denied Feb. 2, 2010.

Application for Transfer Denied April 20, 2010.

---

David G. Brown, Columbia, MO, Carl J. Lumley and Leland B. Curtis, St. Louis, MO, for Appellants.

Steven C. Reed and Lera L. Shemwell, Jefferson City, MO, for Respondent, Missouri Public Service Commission.

David L. Woodsmall, Jefferson City, MO, for respondent, Municipal Gas Commission of Missouri.

Michael R. Tripp, Columbia, MO, for Respondent, Union Electric Company.

Before Division III: THOMAS H. NEWTON, Chief Judge, and JAMES E. WELSH and KAREN KING MITCHELL, Judges.

KAREN KING MITCHELL, Judge.

The Staff of the Public Service Commission of Missouri ("Staff") filed a six-count complaint with the Public Service Commission ("Commission") pursuant to section 386.390.1,[1] alleging that Missouri Gas

1. All statutory references are to RSMo 2000, updated through the 2008 Cumulative Sup-

Company, LLC ("MGC") and Missouri Pipeline Company ("MPC") had violated the terms of their tariffs and regulations of the Commission.[2] The Staff proceeded to a hearing before the Commission on five of the six counts. The Commission found that the Staff proved counts I, III, and IV and entered an order finding that the companies had: (1) provided confidential information and/or preferential treatment to their affiliate, Omega Pipeline Company ("Omega"); (2) charged Omega transportation rates that were lower than the transportation rates that they charged non-affiliate customers; and (3) failed to report the discounted rates that they charged Omega. MGC and MPC filed a writ of review in the Circuit Court of Cole County. On October 10, 2008, the circuit court denied the writ of review, and this appeal followed.

We hold that the Commission's order was lawful and reasonable and therefore affirm.

### Factual and Procedural Background

We consider the facts with all reasonable inferences made in the light most favorable to the Commission's order. *State ex rel. AG Processing, Inc. v. Pub. Serv. Comm'n*, 120 S.W.3d 732, 735 (Mo. banc 2003).

#### A. The Transporters

MGC and MPC are transporters of natural gas, operating interconnected intrastate natural gas pipelines ("the pipeline") in east central Missouri. MGC and MPC (collectively "Transporters") receive natural gas at one end of the pipeline and deliver approximately the same volume of gas to other points on the pipeline. MPC's pipeline runs south from Pike County and connects with MGC's pipeline in Sullivan, Missouri. MGC's pipeline extends from Sullivan to a terminus at the U.S. Army facility at Fort Leonard Wood ("the Fort"). The Transporters provide gas transportation service to numerous communities and local gas distribution companies.

#### B. Omega

Unlike the Transporters themselves, Omega, a gas "marketer" and "shipper," was not regulated by the Commission and was permitted to sell the gas that was transported on the pipeline. The Transporters and Omega were all under the common ownership and/or control of Gateway Pipelines, LLC (or a subsidiary of Gateway), from 2002 until June 1, 2006, when Omega was sold to a third party. As such, Transporters and Omega were "affiliated entities," subject to the Commission's affiliate transaction rule. *See* Mo.Code Regs. Ann. tit. 4, § 240–40.015. Gateway is ultimately owned by two individuals. One of those individuals ("the President") is the president of the Transporters and was the president of Omega while it was affiliated with the Transporters.

plement, unless otherwise indicated.

2. MPC and MGC are "gas corporations," as defined in section 386.020(18), and "public utilities," as defined in section 386.020(43). As monopoly providers of intrastate natural gas transportation service, they were regulated by the Commission and were required to file "tariffs" with the Commission, which establish the rates and conditions for providing service. *See* § 393.140(11). The Commission permitted MGC and MPC to collect fees for the transportation of gas, but it prohibited them from selling gas to anyone. MGC's and MPC's tariffs (collectively, "the tariffs") contain substantially the same terms. On April 20, 2007, MGC and MPC succeeded in reorganizing as an interstate pipeline. As a consequence, their activities, from April 20, 2007, forward, fall exclusively within the jurisdiction of the Federal Energy Regulatory Commission. However, MGC and MPC were subject to regulation by the Commission at all times relevant to this appeal.

Beginning in 1992, Omega entered into a ten-year contract to provide gas to the Fort. That contract expired in 2002, and Omega did not regain this business until 2005. To facilitate the contract with the Fort, Omega became a shipper of natural gas on the pipeline. A shipper ships gas along a transporter's pipeline by purchasing pipeline capacity via a "transportation agreement." Thus, Omega had a business relationship with the Transporters before they became affiliated entities in 2002. Starting on July 1, 2003, Omega began operating as a gas marketer to several entities that obtained natural gas from the Transporters' pipelines. A gas marketer typically purchases gas supplies, administers contracts, and monitors the transportation of gas. Omega's customers included a municipality and three industrial consumers of natural gas.[3]

### C. The Transporters' tariffs

Pursuant to section 393.140(11), the Transporters operate according to the provisions of their tariffs. The Transporters' tariffs contain the following relevant provisions:

First, section 2(b) (General Terms and Conditions),[4] contains provisions requiring the Transporters to see that a balance is maintained between the gas received and the gas delivered. "If, due to operating conditions, the quantities of gas received and delivered are not in balance on any one particular day, such imbalance shall be corrected as promptly as is consistent with operating conditions."

Second, section 12(b) (General Terms and Conditions), requires the Transporters to maintain an appropriate segregation from any marketing affiliates. "For efficiency purposes, [the Transporters] occup[y] office space on the same floor as [their] affiliates, but maintain[ ] separate operational facilities and personnel. Operational and accounting information is confidentially maintained by [the Transporters]."

Third, section 3.2(b) provides the Transporters with the ability to discount rates, within a pre-established range (set out in section 3.1 of the tariffs); however, consistent with section 393.140(5) RSMo, the tariffs preclude the Transporters from discriminating in favor of an affiliate. "The lowest transportation rate charged to an affiliate shall be the maximum rate that can be charged to non-affiliates." § 3.2(b)(1). Sections 3.2(b)(2)–(5) establishes the procedure by which the Transporters can obtain an exception to the rule set out in section 3.2(b)(1) by requesting Commission approval of specific agreements charging a lower rate to an affiliate shipper. Sections 3.2(b)(2)–(5) set out how the Commission will compare rates to determine if a lower rate for affiliates will be approved. In the case of firm service, section 3.2(b)(4) states that "[r]ate comparisons for compliance with these provisions will be calculated assuming a 25% load factor." Load factor is the ratio of a shipper's average daily volume divided by their contracted for capacity.[5]

---

3. Because certain information provided to the Commission during the hearing process was identified as "highly confidential," including the identities of Omega's customers, we will refer to the customers as the City, Industry 1, Industry 2, and Industry 3.

4. The Transporters' tariffs are divided into five parts. Unless otherwise noted, tariff citations refer to the parallel provisions contained

in the "Firm Provisional Transportation Services/Rate Schedule" section and the "Interruptible Provisional Transportation Services/Rate Schedule" section.

5. Although the tariffs' provisions for interruptible and firm service are nearly identical, the 25% load factor requirement in section 3.2(b)(4) applies only to firm service. The distinction between firm and interruptible

Fourth, section 12(c) (General Terms and Conditions), requires the Transporters to provide quarterly reports of any discounted transportation rates.

## D. Transactions between the Transporters and Omega

### i. Rates charged to Omega

As noted above, the Transporters entered into written transportation agreements with Omega for service to the Fort. The Transporters also, however, charged Omega for pipeline capacity used to serve the City and Omega's three industrial customers, though the Transporters did not enter into written transportation agreements with Omega for such charges. The Transporters claim that they charged Omega for such service in Omega's capacity as an agent for other entities, notably the City and one of the three Industrial customers, both of which had firm service transportation agreements with the Transporters. The Staff dispute the Transporters' agency argument, and the Commission rejected it. Irrespective of whether Omega was acting as an agent or a principal, however, it is certain that: Omega was the entity charged for pipeline service and Omega profited from discounted rates. And there is substantial evidence that the City was unaware that Omega was using the City's pipeline capacity to transport gas to other customers or that the transportation rates were being discounted.

The Transporters provide two types of gas service, firm and interruptible. Firm service customers receive gas with no interruptions. To receive this level of service, customers must pay both a reservation charge (to reserve capacity on the pipeline) and a commodity charge for every unit of gas transported through the pipeline. Depending on the supply of gas available, interruptible service customers may or may not receive gas upon demand. These customers do not pay a reservation rate but typically pay a higher commodity charge than firm customers pay.

Before July 1, 2003, Transporters charged all shippers the maximum tariff rates for the type of transportation services purchased. On July 1, 2003, Omega entered into a Natural Gas Sales and Agency Agreement with the City. Under this agreement, Omega would purchase and arrange for transportation of gas for the City. The gas purchased was moved through the pipeline using the capacity reserved by the City under its transportation agreement with the Transporters. The contract required the City to reimburse Omega for the *actual cost of gas purchased* for the City. *Transportation costs*, however, were treated differently. The City agreed to pay Omega a fixed fee per Decatherm [6] ("Dth") of gas delivered to a specific delivery point in the City. The fixed fee covered all transportation costs for firm service, including both reservation and commodity fees. The contract also made Omega the City's agent to "nominate and administer the transportation of natural gas and pay the monthly invoices for

service is explained in more detail infra; however, it appears that the load factor analysis applies only when comparing firm rate customers because a firm rate customer pays an additional fee to reserve transportation capacity but may not use all of that capacity. Thus, depending on other factors, the fact that a shipper or marketer is paying for capacity not used may be considered by the Commission in determining whether to exercise its

discretion to allow a lower rate for an affiliate.

6. A therm is a unit of measure of heat energy equivalent to 100,000 BTU (British Thermal Units). A decatherm is 10x therm or one million BTU. A therm is approximately the energy equivalent of burning 100 cubic feet (Ccf) of natural gas.

the transportation services provided by MPC and MGC, and any other third party transporter."

After July 1, 2003, MGC began charging Omega a reduced commodity charge for delivering gas to the City. Rather than the maximum firm commodity rate set by tariff of $.9433 per Dth that the City had been charged prior to that time, Omega was charged $.20 per Dth. Although the Transporters claimed that they negotiated the discounted rate with the City and that the City accepted the modified rate, the Commission found that there was no credible evidence that the Transporters ever informed the City of the discounted commodity rate. As Omega was the entity actually being billed for the service, there is no reason to believe that the City was ever aware of the discount. Further, because Omega was charging the City the transportation costs set out in the sales and agency agreement, while paying the Transporters the discounted rates, Omega was realizing the benefit of the discount.

In addition, the Transporters transported gas to two other Omega customers, Industry 1 and Industry 2, using the City's pipeline capacity while charging Omega the discounted rate. However, Omega's sales and agency agreement with the City did not give Omega the authority to use the City's pipeline capacity to deliver gas to other customers, and nothing in the Transporters' tariffs allowed one shipper to release its capacity for the use of other shippers. Moreover, there was no evidence that the City was aware that its pipeline capacity was being used to benefit other customers.

Unlike the City, Industry 1 and Industry 2 were interruptible service customers. As such, both Industry 1 and Industry 2 paid no reservation fee, but they would normally have paid the higher commodity rates associated with interruptible service

(see chart infra). However, the Transporters charged Omega the same firm commodity rates for all gas transported using capacity from the City's transportation agreement, regardless of which customer received delivery of the gas and regardless of whether the customer receiving the gas had a contract for firm or interruptible service. In addition, Transporters did not bill Omega separately for each of its marketing customers. Rather, the Transporters sent one bill for all gas transported using the City's transportation capacity and allowed Omega to determine the volumes delivered to each of its customers. The effect of this arrangement was that, for interruptible service to Industry 1 and Industry 2, MGC charged Omega $.20 rather than the maximum rate set by tariff of $1.3765 per Dth, and MPC charged Omega $.1699 rather than the maximum rate set by tariff of $.3036.

The Transporters also gave additional transportation discounts to Omega for service provided to its other marketing customer, Industry 3. Industry 3 had a contract for firm gas transportation services. As noted previously, the rate for firm transportation services is made up of two components, a reservation rate and a commodity rate. In 2005, the Transporters reduced both components of the firm service fee charged to Omega for service to Industry 3. Beginning on May 1, 2005, the Transporters waived the reservation rate charged to Omega for gas delivered to Industry 3. In addition, on June 1, 2005, MGC reduced the commodity rate charged to Omega for gas transported to Industry 3 from $.55 per Dth to $.30 per Dth. Furthermore, on February 1, 2005, MGC reduced the commodity rate charged to Omega for the firm transportation services to the Fort from $.55 to $.30 per Dth. However, the Transporters continued to charge other shippers and marketers the

maximum reservation and commodity rates set out in their tariffs.

As a result of receiving discounted rates, Omega could choose either to: (1) pass those savings along to its customers; or (2) retain the difference between the higher rates paid by its customers and the discounted rates it paid to the Transporters. Under either scenario, Omega benefited: it either received a competitive advantage over other gas marketers or realized additional profits. In addition, by giving an unregulated affiliate discounts, the Transporters could shift income from the regulated utilities to their unregulated affiliate. As the Transporters shifted income to their affiliate, they put themselves in a better position to justify charging higher rates to their captive customers, while at the same time increasing the income of their affiliated entity.

### ii. Balancing

The Transporters did not require Omega to "balance" its gas that flowed through the pipeline. The amount of gas a marketer or shipper nominates onto the pipeline for transportation usually does not match the amount of gas that is actually delivered.[7] To compensate for the inevitable loss of gas, shippers are asked to nominate more gas onto the pipeline than they intend to take out.[8] At some point, Transporters made pipeline improvements that resulted in less lost gas. As a result, excess gas began to accumulate on the pipeline.

As noted, the Transporters' tariffs require them to see that shippers cure any imbalances as promptly as possible, within a 10% variance. However, the Transporters did not require Omega to cure the imbalance that it accumulated. Moreover, the President, by his association with the Transporters, knew when there was an excess of gas in the pipeline, attributable to excess nominations by other shippers, and he applied that knowledge by under-nominating gas that Omega was shipping through the pipeline. Thus, Omega was allowed to use excess gas nominated by other shippers. Omega thereby accumulated an imbalance of more than $1,000,000 worth of gas which it was able to sell to its customers but which it had not paid for or nominated. The Transporters characterize this process as a "service" rendered by Omega and state that "Omega was willing to provide this service without compensation." The Transporters claim that they kept track of the imbalance and that Omega eventually paid back the amount realized from the imbalance as a debt owed.

### E. The Complaint

On June 21, 2006, the Staff filed a Complaint before the Commission alleging that practices between the Transporters and Omega violated the Transporters' tariffs and other Commission rules. Subsequently, the Commission permitted the Municipal Gas Commission of Missouri, a customer of the Transporters and a joint municipal utility commission representing the cities of St. James, Waynesville, St. Robert, and Richland, to intervene in the action against the Transporters.

Count I alleged that, in violation of the Transporters' tariffs and Commission rules, the President used his access to information with the Transporters to effect agreements between the Transporters and

---

7. A number of factors contribute to this variance, including changes in temperature and loss of gas along the pipeline.

8. The amount varied by transportation agreement, but, as an example, the Transporters required one customer to nominate .43% to .50% more gas than the customer actually took out of the system.

Omega that provided Omega with discriminatory advantages. Count III [9] alleged that, in violation of their tariffs, the Transporters charged non-affiliates higher rates than the rates they charged to Omega, an affiliated entity. Count IV alleged that, in violation of their tariffs, the Transporters did not report the discounts they were giving Omega.

### F. The Commission's order

On October 11, 2007, the Commission entered its order finding against the Transporters on Counts I, III, and IV of the Complaint.

The Commission found that the Transporters had violated: (1) section 12(b) of their tariffs (General Terms and Conditions) by not maintaining separate operational facilities or personnel from Omega; (2) section 12(c) of their tariffs (General Terms and Conditions) by failing to report bids for transportation service where the bid is for less than the maximum rate established in the tariff; (3) section 2(b) of their tariffs (General Terms and Conditions) by not requiring Omega to balance the gas they put into the pipeline with the gas Omega took out; (4) MO.CODE REGS. ANN. tit. 4, § 240–40.015(2)(B) (the affiliate transaction rule) by providing its affiliate with preferential service, information, and treatment; and (5) section 3.2(b)(1) of the tariffs by charging their non-affiliates transportation rates that were higher than the rates they charged Omega.

The Commission made the factual finding that the Transporters charged Omega discounted rates while the Transporters continued to charge other shippers the maximum tariff rates. The net effects of the rate reductions offered to Omega between June 1, 2003, and June 1, 2005, are reflected in the charts below:

**Maximum rates set out in the tariff and charged to non-affiliates**

| Transportation Type/ Delivery Points | Firm | Firm | Interruptible |
|---|---|---|---|
| | Reservation per MDQ [10] | Commodity Per Dth. | Commodity Per Dth. |
| MPC Delivery | $ 4.3181 | $.1699 | $ .3036 |
| MGC Delivery Except the Fort | $13.1766 | $.9433 | $1.3765 |
| MGC Delivery to the Fort | $18.10 | $.55 | $1.15 |

**Reduced rates charged to Omega as a shipper and/or marketer**

| Transportation Type/ Delivery Points | Firm | Firm | Interruptible |
|---|---|---|---|
| | Reservation per MDQ | Commodity Per Dth. | Commodity Per Dth. |
| MPC Delivery | $0.00 beginning May 1, 2005 | $.1699 | $.1699 beginning September 1, 2003 |
| MGC Delivery Except the Fort | $0.00 beginning May 1, 2005 | $.20 beginning July 1, 2003 (for the City) $.30 beginning June 1, 2005 (Industry 3) | $.20 beginning September 1, 2003 |

9. Counts II and V are not at issue here.

10. MDQ is the maximum daily quantity of gas that Transporters were obligated to deliver for a shipper.

| | | $.30 beginning | |
|---|---|---|---|
| MGC Delivery to the Fort | $18.10 | February 1, 2005 | $1.15 |

The Commission made the conclusion of law that, pursuant to section 3.2(b)(1) of the tariffs, the Transporters could not have lawfully charged their non-affiliated customers rates in excess of those rates charged to Omega.

On November 21, 2007, the Transporters filed their Petition for Writ of Review in the Cole County Circuit Court. On October 10, 2008, the Cole County Circuit Court issued its Judgment, affirming the Commission's Revised Report and Order ("Order") and finding that the Order "is lawful, reasonable, and supported by substantial and competent evidence on the record as a whole, and is not arbitrary, capricious, or an abuse of discretion." On November 12, 2007, the Transporters filed their Notice of Appeal with the Cole County Circuit Court. The Transporters filed their appeal bond on the same day they filed their Notice of Appeal.

### Standard of Review

"We review the Commission's Order, not the circuit court's judgment...." *State ex rel. Laclede Gas Co. v. Pub. Serv. Comm'n,* 156 S.W.3d 513, 520 (Mo.App. W.D.2005). We do so using a two-pronged standard. *Deaconess Manor Ass'n v. Pub. Serv. Comm'n,* 994 S.W.2d 602, 609 (Mo.App. W.D.1999). First, we must determine whether the order was lawful. *Id.* Second, we must determine whether the Commission's order was reasonable. *Id.* at 611. On appeal, the burden is on the appellant to show that the Commission's order was either unlawful or unreasonable. *State ex rel. St. Louis v. Pub. Serv. Comm'n,* 335 Mo. 448, 73 S.W.2d 393, 397 (1934).

### Discussion

#### I. Jurisdiction

The Staff and Missouri Gas Commission (collectively, "Respondents") argue that the Transporters were required to file an appeal bond within ten days after the circuit court entered its judgment. Section 386.540.2 provides that "[n]o appeal shall be effective" unless a "cost bond of appeal ... shall be filed within ten days after the *entry* of judgment in the circuit court appealed from." (Emphasis added.) Here, the Transporters filed their appeal bond within ten days of the circuit court's judgment becoming final, but they did not file an appeal bond within ten days after *entry* of judgment.

The Transporters argue that section 386.540.2 presupposes the existence of a right of appeal; ergo, the appeal bond requirement cannot be triggered until an appellant's right to appeal exists. We agree.

■■■■ Where the language of a statute is ambiguous, the intent of the Legislature must be discerned and given effect. *Knob Noster Educ. v. Knob Noster R–VIII,* 101 S.W.3d 356, 361 (Mo.App. W.D.2003). Section 386.540.2, by contemplating that there is a judgment to be "appealed from," appears to intend for a judgment to be final before the appeal bond is filed. However, section 386.540.2 speaks of entry of judgment, not entry of final judgment. The Legislature drafted section 386.540.2 well before Rule 81.05 was adopted. Under Rule 81.05, a judgment is "entered," at a minimum, thirty days before it becomes "final" and appealable. The Rule creates an automatic thirty-day lag between entry of judgment and the right to appeal that did not exist when the Legislature drafted section 386.540.2. Thus, the statute is rendered ambiguous, and we must give effect to the Legislature's intent. *See State ex*

*rel. Nixon v. Premium Std. Farms, Inc.,* 100 S.W.3d 157, 162 (Mo.App. W.D.2003). When a statute is ambiguous, "[c]ourts must avoid statutory interpretations that are unjust, absurd, or unreasonable." *Id.*

■ If we were to accept Respondents' reading of the statute, appellate jurisdiction would be denied unless the appellant filed its appeal bond at least twenty days *before* the right to appeal existed. We find such an interpretation to be unreasonable. Because Rule 81.05 did not exist when the Legislature drafted section 386.540.2, the Legislature did not contemplate an automatic thirty-day lag between entry of judgment and finality of judgment. As such, we hold that section 386.540.2 requires an appeal bond within ten days of the judgment becoming final. Since the Transporters filed their appeal bond within ten days of the circuit court's judgment becoming final, this court has jurisdiction.

## II. Lawfulness

■ "The lawfulness of the order turns on whether the Commission had statutory authority to act as it did." *Deaconess Manor,* 994 S.W.2d at 609. In this analysis, "we exercise independent judgment and do not defer to the Commission." *Id.* The Transporters allege that the Commission's Order was unlawful in that it violated due process and employed an unauthorized ratemaking procedure.

### A. Due process

■ "The due process clauses under the United States and Missouri constitutions prohibit the taking of life, liberty, or property without due process of law." *Colyer v. State Bd. of Registration for the Healing Arts,* 257 S.W.3d 139, 144 (Mo. App. W.D.2008). Due process requires notice and a hearing; moreover, the adequacy of the notice and the hearing must be evaluated in the context of the specific procedure at issue, in this case, an administrative proceeding. *Id.* at 144–45.

"In an administrative proceeding, due process is provided by affording parties the opportunity to be heard in a meaningful manner. The parties must have knowledge of the claims of his or her opponent, [and] have a full opportunity to be heard, and to defend, enforce and protect his or her rights." *Weinbaum v. Chick,* 223 S.W.3d 911, 913 (Mo.App. S.D.2007) (internal quotation omitted). "[A] party to an administrative hearing must be given the opportunity to hear evidence submitted against him, to confront and cross-examine witnesses, and to rebut testimony of such witnesses by evidence on his own behalf." *Jackson v. Sayad,* 741 S.W.2d 847, 852 (Mo.App. E.D. 1987).

### i. Sufficiency of the Complaint

■ The Transporters first argue that the Complaint filed by the Staff was insufficient to put them on fair notice of the charges against them. We disagree.

Count I of the Complaint charged the Transporters with violation of their tariffs, which prohibited discriminatory practices with respect to affiliate transactions. The Complaint alleged that the Transporters failed to maintain separate facilities and personnel from Omega, improperly shared confidential information with Omega, and took advantage of the President's "inside knowledge of pipeline information such as pipeline gas imbalances, lost and unaccounted for gas levels, actual daily gas demands, and information regarding other individual shippers that is not available to any shipper on the MPC/MGC system." These acts, separately and in combination, put Omega at a competitive advantage vis-à-vis other gas marketers and shippers.

In finding against the Transporters in Count I, the Commission found that the

shared president of the Transporters and Omega used confidential information to set up transactions that were advantageous to Omega. Specifically, the Commission found that Omega knew when there was excess gas in the pipeline system, and that knowledge, combined with Omega's agreement with the Transporters, permitted Omega to under-nominate the gas it was transporting. Omega then would be able to collect and sell the excess gas that had been left in the pipeline system.

Count III of the Complaint alleged that the Transporters charged Omega rates that were lower than the rates charged to non-affiliated entities. Specifically, the Complaint alleged that, when the Transporters gave Omega a discount, they effectively set the maximum that could be charged to non-affiliates pursuant to section 3.2(b)(1) of the Transporters' tariffs. Count III cited the rates charged to Omega in connection with the City, the Fort, and Industry 1. In the Complaint's statement of facts, the Staff alleged that Omega provided services to Industries 2 and 3 and that the Transporters generally provided Omega with discounted rates.

In finding against the Transporters in Count III, the Commission found that Omega received discounted rates from the Transporters in conjunction with providing services to the City, the Fort, and Industries 1, 2, and 3.

In Count IV of the Complaint, the Staff alleged that the Transporters violated section 12(c) of their tariffs by failing to disclose to the Commission the discounted transportation rates they gave to their affiliate.

In finding against the Transporters in Count IV, the Commission found that the Transporters failed to disclose the discounts that the Transporters had charged Omega.

Accordingly, as to Counts I, III, and IV of the Complaint, we hold that the Transporters were given notice of the nature of the Staff's claims and thus had the knowledge necessary to defend against the charges. Therefore, due process was satisfied with respect to each count. *See Weinbaum,* 223 S.W.3d at 913–14.

### ii. Allowing supplemental oral argument

 The Transporters also claim that the Commission violated due process by requiring an oral argument after the hearing on the merits had taken place. However, MO.CODE REGS. ANN. tit. 4, § 240–2.140(1) clearly allows the Commission to order oral argument: "The commission or presiding officer shall determine whether the parties may file briefs or present oral argument, or both, in any case." The Transporters were given notice of the oral argument and had the opportunity to defend themselves at that argument.

The Transporters claim that opposing counsel was allowed to testify at the oral argument regarding the "balancing" arrangement between Omega and the Transporters. However, evidence of that relationship was presented at the hearing, and counsel for the Staff merely reviewed and summarized that evidence at oral argument. The Transporters' attorney was given the same opportunity to summarize the evidence and advocate for the Transporters' position. Therefore, due process was satisfied. *See Weinbaum,* 223 S.W.3d at 913.

### iii. Evidence of rates charged to Omega

 The Transporters claim that the Commission violated due process by finding that the Transporters began giving Omega discounted rates as of July 1, 2003. This claim relates to the Commission's re-

liance on re-created invoices for services provided to Omega in 2004 and 2005 and inferences drawn from those invoices as to charges to Omega in the second half of 2003.

In January 2006, the Staff sought production of invoices showing the bills Transporters sent to their customers dating back to July 1, 2003. The Transporters informed the Staff that the original paper invoices had been mailed to the customers and that the Transporters had not retained the actual invoices. Instead of invoices, the Transporters provided the Staff with a revenue summary spreadsheet for 2005. The spreadsheet did not reveal the existence of additional customers being served through the City's pipeline capacity. The Transporters also provided re-created invoices for 2004 and 2005. The Staff contacted various customers to obtain actual invoices. The City provided invoices that revealed that some of the gas Transporters showed as delivered to the City was actually delivered to other Omega customers.

During deposition, the Transporters' former CFO/Controller testified that, from July 2002 until May 2006, he had retained the "summary sheet, the front page" of invoices in his office. Transporters ultimately produced actual copies of the face sheets from the invoices, but they claimed that the complete documents were not in their files. In response, the Staff filed a Motion for Sanctions alleging that someone working for Transporters had deliberately destroyed the original invoices for 2003–2005. The Staff sought monetary sanctions and adverse evidentiary inferences. The Commission denied monetary sanctions.

However, the Commission was troubled by Transporters' failure to provide even re-created invoices for 2003. Noting that public utilities are required both by statute and rule, *see* section 393.140(4) and Mo. Code Regs. Ann. tit. 4, § 240–10.010, to maintain vital records and make them available to the Commission, the Commission concluded that it was "unbelievable" that Transporters would produce invoices, mail them to customers, and then fail to retain either a paper or electronic copy of such invoices. Further, the Commission found that the inability to produce the invoices was "very unusual" and that such inability established that the Transporters were "at least grossly incompetent." Based on these findings, the Commission allowed Staff to infer that the Transporters' rates for the period from July 1, 2003, until December 31, 2003, were consistent with the rates reflected in the re-created invoices for 2004–2005.

■■■ The Commission has broad discretion in evidentiary determinations. *Friendship Vill. of S. County v. Pub. Serv. Comm'n*, 907 S.W.2d 339, 345 (Mo.App. W.D.1995). We will not substitute our judgment for that of the Commission on an issue of fact. *Deaconess Manor*, 994 S.W.2d at 611. Moreover, all reasonable factual inferences will be made in the light most favorable to the Commission's order. *State ex rel. AG Processing, Inc.*, 120 S.W.3d at 735.

The Commission did not abuse its discretion in finding that the Transporters began giving Omega discounts starting in 2003. Because evidence showed that Omega was receiving discounts in 2004, it was reasonable to infer that the discounts also were in effect in the latter half of 2003, especially given that the Transporters inexplicably could not produce or re-create invoices for that period. In the absence of contradictory evidence, we cannot substitute our judgment for that of the Commission. *Deaconess Manor*, 994 S.W.2d at 611.

Most importantly for the purposes of due process, the Transporters had ample notice and opportunity to defend themselves on this issue; therefore, the Commission's ruling on this point was not unlawful. *See Weinbaum*, 223 S.W.3d at 913.

### B. Unauthorized ratemaking

■ The Transporters argue that the Commission acted unlawfully when it declared that, pursuant to their tariffs, the Transporters could only have charged non-affiliates the lowest rate they charged to Omega.[11]

■ The Transporters' tariffs provide that "[t]he lowest transportation rate charged to an affiliate shall be the maximum rate ... charged to non-affiliates." § 3.2(b)(1) of the tariffs. The Commission had the authority to interpret and apply this provision. *Deaconess Manor*, 994 S.W.2d at 609. The Commission has the exclusive jurisdiction, in the first instance, to determine the lawful rate that should have been applied to a customer. *Inter–City Beverage Co. v. Kansas City Power & Light Co.*, 889 S.W.2d 875, 877–78 (Mo. App. W.D.1994); *De Maranville v. Fee Fee Trunk Sewer, Inc.*, 573 S.W.2d 674, 676 (Mo.App.1978). "[T]here can be no doubt that the Public Service Commission has exclusive jurisdiction to determine and classify which of two approved rates apply to a customer of a public utility." *State ex rel. Kansas City Power & Light Co. v. Buzard*, 350 Mo. 763, 168 S.W.2d 1044, 1047 (1943). The Commission had the exclusive jurisdiction to determine whether the rate scheme approved in section 3.2(b)(1) of the tariffs applied to a non-affiliate customer like Municipal Gas Com-

mission of Missouri. *Buzard*, 168 S.W.2d at 1047. As such, the Commission did not act beyond its authority in finding that the rate charged to Omega was the maximum rate that the Transporters could have lawfully charged to non-affiliates.

■ The Transporters argue that the Commission made a new rate and that therefore it was required to go through a new ratemaking procedure. We disagree.

The Transporters' tariffs establish two different schemes for determining the maximum rate that the Transporters could lawfully charge to non-affiliates. Section 3.1 of the tariffs lists certain maximum rates that apply *assuming* that the Transporters charged those rates to their affiliates; however, section 3.2(b)(1) states that the lowest rate charged to an affiliate shall be the maximum rate charged to non-affiliates. Thus, contrary to Transporters' argument, there is no new rate at issue here. Rather, the question is which of the tariffs' two rates schemes applies: that found in section 3.1 or that found in section 3.2(b)(1). The Commission found that the Transporters were charging Omega rates that were lower than the rates listed in section 3.1. Therefore, pursuant to section 3.2(b)(1), the rate charged to Omega was the applicable rate to be charged to non-affiliates. The Commission had the authority to interpret the tariff, *see Deaconess Manor*, 994 S.W.2d at 609, and to determine which rate scheme applied to certain customers. *See Inter–City Beverage Co.*, 889 S.W.2d at 878; *De Maranville*, 573 S.W.2d at 676. Therefore, the Commission did not act unlawfully in finding that, under section 3.2(b)(1), the rate charged to Omega was the maximum rate

---

11. We will discuss whether the Commission erred in calculating the rate charged to Omega below. That issue, although related, is a factual issue that must be determined using a more deferential standard of review. Wheth-

er the Commission had the *authority* to find that the rate charged to Omega was the maximum rate under the tariff is a question of lawfulness that must be determined under the *de novo* standard.

that could be lawfully charged to non-affiliates.

■■■ The Transporters argue that applying section 3.2(b)(1) as the Commission did violates the prohibition against automatic rate adjustments. *See State ex rel. Util. Consumers Council of Mo., Inc. v. Pub. Serv. Comm'n,* 585 S.W.2d 41, 45–47 (Mo. banc 1979). In *Utility Consumers,* the court found a tariff approved by the Commission to be unlawful in that it permitted a utility to automatically increase or decrease rates based on the price of fuel and other costs incurred by the utility. *Id.* There, the plaintiffs challenged the lawfulness of the Commission's order that approved the tariffs' fuel adjustment clause. *Id.* at 44–45. The court found that the Commission had acted unlawfully in approving the fuel adjustment clause because there was no statutory authority "to establish a variable rate by use of a fuel adjustment clause." *Id.* at 56. The court held further that sections 393.270.2 & .3 mandate that rates be fixed by the Commission. *Id.*

■■■ Unlike the tariffs in *Utility Consumers,* the lawfulness of the tariffs in this case has not been challenged. "A tariff is a document which lists a public utility services and the rates for those services. A tariff has the same force and effect as a statute, and it becomes state law." *State ex rel. Mo. Gas Energy v. Pub. Serv. Comm'n,* 210 S.W.3d 330, 337 (Mo.App. W.D.2006) (internal citation omitted). We are required to deem a tariff lawful unless a lawsuit has been filed whose purpose is to challenge the tariff.

All rates, tolls, charges, schedules and joint rates fixed by the commission shall be in force and *shall be prima facie*

*lawful,* and all regulations, practices and services prescribed by the commission shall be in force and shall be prima facie lawful and reasonable *until found otherwise in a suit brought for that purpose* pursuant to the provisions of this chapter.

§ 386.270 (emphasis added). Where no lawsuit has been filed challenging a tariff, "[t]he General Assembly ... has mandated that we deem the rates, tolls, charges, schedules and joint rates fixed by the commission to be lawful and reasonable." *A.C. Jacobs & Co. v. Union Elec. Co.,* 17 S.W.3d 579, 583 (Mo.App. W.D.2000) (internal quotations omitted).

The Transporters did not bring a lawsuit challenging the lawfulness of their tariffs.[12] Indeed, the Transporters themselves explicitly state in their reply brief that the tariffs were lawful, reasonable, and established pursuant to a lawful ratemaking process. Because no lawsuit challenging the lawfulness of section 3.2(b)(1) of the tariffs has been filed, that issue is not properly before us, and we must deem the tariff to be lawful and reasonable. § 386.270; *A.C. Jacobs & Co.,* 17 S.W.3d at 583.

Accordingly, we hold that the Commission acted lawfully in enforcing the tariffs and in declaring which rate scheme applied to the Transporters' non-affiliate customers. Moreover, the lawfulness of the tariffs is not properly before us, and therefore we reject without deciding the Transporters' argument that the tariffs contain an unlawful automatic rate adjustment clause.

### III. Reasonableness

■■■ Once we have determined that the Commission's order was lawful, we must also find that it was reasonable. "An

---

**12.** The instant case was brought by the Staff seeking to enforce the tariffs. *See* § 386.390.1.

order is reasonable if it is supported by substantial and competent evidence on the whole record." *Deaconess Manor,* 994 S.W.2d at 611. "Substantial evidence" is competent evidence that, if true, has a probative force on the issues. *Friendship Vill.,* 907 S.W.2d at 345. We will reverse the Commission's order only where it is "clearly contrary to the overwhelming weight of the evidence." *Id.* The Commission has broad discretion in evidentiary determinations. *Id.* "As to matters of reasonableness, the court determines whether the order was supported by substantial and competent evidence on the whole record, whether the decision was arbitrary, capricious, or unreasonable, or whether the Commission abused its discretion." *Id.* at 344–45. "[T]he reviewing court will not substitute its judgment for that of the Commission on issues within the realm of the agency's expertise." *Id.* at 345. "If the Commission's decision is based on purely factual issues, we may not substitute our judgment for that of the Commission." *Deaconess Manor,* 994 S.W.2d at 611.

The Transporters argue that the Order was unreasonable in that it erroneously found that: (1) Omega was charged discounted rates; (2) the Commission was not required to satisfy the "notice" provision of section 3.2(c) of the Transporters' tariffs; and (3) the Transporters transferred confidential information to Omega, and/or Omega used such information.

**A. The Commission did not err in finding that Omega was charged discounted rates.**

The Transporters argue that the Commission's order was unreasonable in that it erroneously found that Omega was charged discounted rates. We disagree.

**i. The Transporters violated their tariffs by charging Omega discounted rates.**

Section 3.2(b)(1) provides:

b. For all Transportation Agreements entered into by Transporter with any affiliate of Transporter . . .

(1) The lowest transportation rate charged to an affiliate shall be the maximum rate that can be charged to non-affiliates. Any renegotiation or other type of modification to the rates of any then-effective Transportation Agreement is to be considered an applicable Transportation Agreement for the purpose of setting this maximum rate for non-affiliates.

There is substantial and competent evidence that the rates of a "then-effective Transportation Agreement" were modified to discount the rates, that Omega was charged the discounted rates, and that Omega benefited from the discounted rates.

According to the expert testimony of Robert Schallenberg, before July 1, 2003, Transporters charged all shippers the maximum rates set out in the tariffs for transportation services. The 2004 re-created invoices from MGC to Omega showed that Omega was charged a commodity rate of $.20 per Dth for firm service, discounted from the prior rate of $.9433. As previously discussed, the Commission found that that rate applied retroactively to July 1, 2003. In addition, the Commission found from the invoices to Omega that, as of February 1, 2005, MGC charged Omega $.30 per Dth for firm service to the Fort. Further, the Commission found from the invoices to Omega that the Transporters stopped charging Omega a reservation fee for firm service as of May 1, 2005. Finally, the Commission found that the Transporters charged Omega $.30 per Dth for service to Industry 3. These charges were lower than the amount charged to non-affiliates.

The Transporters argue that the discounted rates applied to the City not to Omega because Omega was merely the agent for the City for most of these charges. The Commission rejected this argument, finding the letter from the Transporters to the City, which allegedly established that the City was the principal party who negotiated for and received the lower rate, lacked credibility. The letter, which purportedly memorialized a previous discussion in which MGC agreed to give the City a discounted commodity rate, was not formatted like other such letters to municipalities and did not contain a signature from the recipient agreeing to the modification. These inconsistencies led the Commission to conclude that the letter was created after the fact to bolster the Transporters' position. As Omega handled all billing for the City, there is no credible evidence in the record that the City was even aware of the discounted commodity rate. This was a factual issue for which we will not substitute our judgment for that of the Commission, see *Deaconess Manor*, 994 S.W.2d at 611, and the Commission was within its discretion in finding as it did.

Moreover, substantial evidence supports the conclusion that Omega, not the City, benefited from the discount. In the Natural Gas Sales and Agency Agreement entered into between the City and Omega, the City agreed to pay Omega a fixed fee per Dth of gas delivered. That fixed fee covered all transportation costs for firm service. The Commission found that "Omega was charging [the City] the transportation costs set in the sales and agency agreement, while paying MPC and MGC the discounted commodity charge identified by Staff. Omega kept the difference as profit." The Commission so concluded by comparing the rates listed in the agreement between Omega and the City with the rates the Transporters actually charged Omega. Such evidence is substantial and competent, and the Commission did not err in concluding that Omega, not the City, benefited from the discounted rates charged by the Transporters.

Omega also benefited in that it used the City's pipeline capacity (although it had no authority to do so) and the discounted firm commodity rate to serve other customers, including Industry 1 and Industry 2. This use of the City's pipeline capacity and rates had the effect of also discounting the interruptible commodity service rate charged to Omega. As interruptible service customers, Industry 1 and Industry 2 normally paid only a commodity rate (unlike firm customers that also paid a reservation rate), but their commodity rate was higher than that paid by firm service customers. But the Commission concluded, based on the re-created invoices, that Omega was charged the same firm commodity rate for all of its customers that used the City's pipeline capacity, even those with interruptible service contracts. Thus, MGC lowered the interruptible commodity rate charged to Omega from $1.3765 to $.20 per Dth, and MPC lowered the interruptible commodity rate charged to Omega from $.3036 to $.1699 per Dth.

Moreover, even if Omega had passed the savings resulting from the discounted rates on to the City or its other customers, Omega would still have been receiving a competitive advantage because its relationship with the Transporters would have allowed it as agent to procure a lower rate for its principals, thus rendering it likely that Omega would continue to receive business from those principals.

The evidence relied upon by the Commission was competent and substantial and supports the conclusion that the Transporters charged Omega discounted rates, pursuant to either an unwritten

transportation agreement between the Transporters and Omega or a renegotiation/modification of an existing transportation agreement with the City. As such, the Transporters violated section 3.2(b)(1) even if they negotiated and charged Omega lower rates while Omega was acting as the agent of the City.

Accordingly, we hold that the Commission's findings on this point were supported by substantial evidence, were not arbitrary or capricious, and were not an abuse of discretion.[13]

### ii. The Commission was not required to calculate the rates charged to Omega assuming a 25% load factor.

■■■■ The Transporters argue that the Commission was required to apply a 25% load factor in calculating the amounts they charged Omega. We disagree.

Under section 3.2(b)(1) of the tariffs, the "lowest transportation rate charged to an affiliate shall be the maximum rate that can be charged to non-affiliates." Section 3.2(b)(2) requires that the Transporters receive Commission approval if they wish to charge a non-affiliate any amount greater than the amount they were charging an affiliate. Section 3.2(b)(3) of the tariffs requires the Transporters to "submit a rate comparison for all Transportation Agreements." Section 3.2(b)(4) of the tariffs states that "[r]ate comparisons for compliance with these provisions will be calculated assuming a 25% load factor."

The Commission found that sections 3.2(b)(2)–(5) provided the Transporters with a way to seek an exception to the requirement of section 3.2(b)(1) that the rate charged to an affiliate shall not be less than the rate charged to non-affiliates.

Accordingly, sections 3.2(b)(2)–(5) placed the onus on the Transporters to provide rate comparisons, calculated assuming a 25% load factor, when seeking an exception to section 3.2(b)(1). However, the Transporters never sought Commission approval for an exception to section 3.2(b)(1); indeed, they maintain that no exception was ever needed. Since no exception was sought, sections 3.2(b)(2)–(5) were never triggered. As such, the 25% load factor noted in section 3.2(b)(4) need not be applied here.

Moreover, contrary to the Transporters' contention, the Staff did, in fact, submit rate comparisons that were calculated assuming a 25% load factor. Robert Schallenberg, the Staff's expert witness, submitted rate comparisons for firm service that were calculated assuming a 25% load factor. The comparisons showed that the Transporters were not in compliance with their tariffs in that the Transporters charged Omega transportation rates that were lower than the transportation rates charged to non-affiliates.

As such, we hold that the Commission's findings on this point were supported by substantial evidence, were not arbitrary or capricious, and were not an abuse of discretion.

### B. The Commission did not err in finding that the Staff was not required to proceed under section 3.2(c) of the tariffs.

■■■■ The Transporters argue that the Staff did not comply with the tariffs in that the Staff did not issue the notice required by section 3.2(c) of the tariffs. We disagree.

---

13. The Transporters concede that our determination of this point in the Respondents' favor decides by implication that the Commission did not err in finding that the Transport-ers failed to report the discounts they charged Omega. Accordingly, we will not address that issue further.

Section 3.2(c) of the Transporters' tariffs applies only *"[i]f at some point in time the* Staff of the Commission determines that the provisions of Section 3.2(b) and Section 12(c)[14] [General Terms and Conditions] are not effective in preventing rate discrimination to non-affiliates." (Emphasis added.) In such cases, "after contacting Transporter, the Staff *may* file a notice to that effect with the Commission." (Emphasis added.)

Section 3.2(c) is only triggered upon a determination by the Staff that section 3.2(b) and section 12(c) were ineffective in achieving their purpose of preventing rate discrimination. For example, if, for some reason, section 3.2(b)(2) was technically complied with yet discrimination existed nevertheless, the Staff could proceed under section 3.2(c). However, nothing in section 3.2(c) prevented the Staff from filing a complaint to enforce section 3.2(b)(1). Indeed, section 3.2(c) would only have applied if the Staff had first determined that enforcing section 3.2(b)(1) would have been ineffective in preventing rate discrimination.

Here, the Staff and Commission determined section 3.2(b)(1) had been violated and filed a complaint to enforce its terms. Since there was no determination by the Staff that this process was ineffective, section 3.2(c) was never triggered.

As such, we hold that the Commission did not abuse its discretion in concluding that section 3.2(c) of the tariffs had not been triggered.

## C. The Commission did not err in finding that Omega misused confidential information.

▉ The Transporters argue that the Commission erred in finding that the President, who at the relevant times was the president of the Transporters and Omega, misused confidential information in Omega's dealings with the Transporters. We disagree.

Section 12(b) (General Terms and Conditions) of the tariffs provides that "[f]or efficiency purposes, [the Transporters] occup[y] office space on the same floor as [their] affiliates, but maintain[ ] separate operational facilities and personnel. Operational and accounting information is confidentially maintained by [the Transporters]." Moreover, "[e]xcept as necessary to provide corporate support functions, the regulated gas corporation shall conduct its business in such a way as not to provide any preferential service, information or treatment to an affiliated entity over another party at any time." Mo.CODE REGS. ANN. tit. 4, § 240–40.015(2)(B).

It is undisputed that the President knew when there was extra gas in the pipeline and that he took advantage of that knowledge by under-nominating gas that Omega was shipping through the pipeline. It is also undisputed that Omega thereby accumulated an imbalance of more than $1,000,000 worth of gas. It is also undisputed that no other entity was allowed to under-nominate gas with the knowledge that excess gas in the system could be used.

Omega's accumulation of a $1,000,000 imbalance clearly provided it with a benefit that was not available to unaffiliated entities. The Transporters argue that there is nothing wrong with the arrangement because they kept track of the "debt" owed by Omega to the Transporters and because Omega paid back that debt when Omega was sold to a third

14. Section 12(c) requires that the Transporters report any discounted rate to be charged to any party.

party. Even if that were true, the Transporters are essentially arguing that they ultimately received the benefit from the arrangement, not Omega. Omega was able to profit by selling the excess gas that was stored in the pipeline. If that profit ultimately flowed back to Transporters, then the arrangement essentially allowed the Transporters to sell gas, which they were prohibited by law from doing. As the Commission's order noted "[s]o long as Omega was owned by the same people that owned MPC and MGC, [the] imbalance represented additional unregulated profit that could be hidden from regulators." Accordingly, the Commission did not err in finding that the Transporters allowed Omega to use confidential information in a discriminatory manner.

As such, we hold that the Commission's findings on this point were supported by substantial evidence, were not arbitrary or capricious, and were not an abuse of discretion.

## Conclusion

We find that the Commission's order was lawful and reasonable in all respects. Accordingly, the Commission's order is affirmed.

THOMAS H. NEWTON, Chief Judge, and JAMES E. WELSH, Judge, concur.

---

1. All statutory references are to RSMo. 2000, unless otherwise indicated.